UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD PAREDEZ,                          No. C 11-3351 SI (pr)

         Plaintiff,                     **ORDER GRANTING SUMMARY
                                    JUDGMENT FOR DEFENDANTS**

    v.

HEDGPETH; et al.,

         Defendants.
_____/

## INTRODUCTION

Richard Paredez, a California prisoner currently housed at the Richard J. Donovan Correctional Facility, filed this *pro se* civil rights action under 42 U.S.C. § 1983. Defendants have moved for summary judgment on plaintiff's complaint. For the reasons discussed below, the motion will be granted and judgment entered in defendants' favor.

## BACKGROUND

The following facts are undisputed unless otherwise noted:

The events and omissions giving rise to the complaint occurred at Salinas Valley State Prison from August 2010 through January 2011, where Paredez was then housed. Defendant Bright was the chief physician and surgeon, defendants Mack and Tuvera were physicians and surgeons, and defendant Steele was a licensed psychiatric technician at Salinas Valley.

On September 21, 2010, Paredez saw Dr. Tuvera for complaints about spinal pain in his lower back. At the time, Paredez had chronic medical issues with his prostate gland and had received antibiotics as treatment. *See* Sullivan Decl., Ex. L. Given this history, Dr. Tuvera believed the prostate inflammation might have spread to the lower vertebrae. Dr. Tuvera ordered

blood tests to monitor Paredez's response to the antibiotics and ordered an x-ray of Paredez's lumbrosacral spine to screen for possible spinal infection.  He also requested a cane for the patient and prescribed new pain medication.  The medical progress notes showed that Paredez had been receiving aspirin and Naprosyn. *See id.*  At the September 21 appointment, Dr. Tuvera prescribed 30 milligrams of morphine sulfate twice a day.  The morphine sulfate prescribed was in sustained action ("SA") form, which was time released, stayed at a steadier level in the bloodstream and could be taken less frequently than the immediate release ("IR") formulation of the same drug.   Patients are instructed to swallow the morphine sulfate SA as a whole pill; this medication should not be broken in half, crushed, or chewed because doing so may cause a potentially fatal rapid release of the drug into the bloodstream.

On October 6, 2010, Paredez saw Dr. Tuvera and again complained of severe back pain. After consulting the x-ray, Dr. Tuvera ruled out the possibility that the prostatitis had extended to the lower vertebrae.  He referred Paredez to an outside hospital for a CT scan of his pelvis and lumbar regions to aid in the diagnosis.   Dr. Paredez continued the morphine sulfate SA prescription, and added a prescription for morphine sulfate IR for breakthrough pain.  Dr. Tuvera also ordered a temporary wheelchair for Paredez.

Between October 6, 2010 and October 21, 2010, Paredez was diagnosed with osteomyelitis of the lumbar, an infection of the lower vertebrae.  He was treated at an outside hospital with intravenous antibiotics.  His treatment was interrupted because Paredez requested to be transferred back to prison.

On October 21, Dr. Tuvera examined Paredez in a follow-up appointment.  Dr. Tuvera spoke to Paredez, who agreed to resume intravenous antibiotics.  Dr. Tuvera continued the morphine sulfate SA 30 mg. twice a day and morphine sulfate IR, and submitted a chrono for a cane in addition to the previously requested wheelchair.

On October 22, 2010, Dr. Bright conducted an Americans with Disabilities Act ("ADA") consultation in response to an administrative grievance written by Paredez that requested a cane or wheelchair and to be housed in a lower bunk.  *See* Sullivan Decl., Ex. H.  During the consultation, Paredez complained of ongoing back pain for which he was scheduled to receive

six weeks of intravenous antibiotics, although Paredez admitted he had refused treatment after two weeks of receiving the antibiotics.  Dr. Bright rejected the requested cane and wheelchair, although he did advise that Paredez should be moved to a lower bunk for two weeks.  He explained his reasoning for denying the cane and wheelchair:

> At the time of the October 22, 2010 consultation, Paredez did not have spinal cord compression and was able to ambulate.  This assessment was based on a physical exam and the patient's medical history.  In my professional opinion, a walking cane or a walker would only relieve pressure off of one of Paredez's legs and would not relieve him of back pain.  An instance where a walking cane would be appropriate is if there was pressure on a nerve that was causing atrophy or muscle weakness in a patient's leg. Similarly, a patient requiring a wheelchair would need to show weakness in both legs. A wheelchair does not relieve back pain because pressure on the spine would stay the same whether the patient was standing or sitting.

Bright Decl., ¶ 6.

On October 26, 2010, Dr. Tuvera examined Paredez and increased his morphine sulfate SA to 45 milligrams twice a day.

On October 29, 2010, Paredez was transferred to the California Men's Colony ("CMC") primarily for antibiotic therapy for his spinal infection.  While at CMC, he was diagnosed with Valley Fever on November 10, 2010, and prescribed Diflucan for it.  *See* Docket # 30-4, ¶. 3-4. That medical record from the acute care hospital at CMC stated:

> [T]he patient was admitted to receive another 4 weeks of intravenous vancomycin along with the oral levofloxacin in the empiric treatment of suspected staphylococcal osteomyelitis versus diskitis versus epidural abscess.  Upon his arrival, the patient refused antibiotic therapy citing a number of concerns including dislike of food, dislike of his isolation in administrative segregated cell, lack of television, lack of electric bed or heart monitor.  He was seen in consultation by Mental Health Service, and after several days of this refusal, he ultimately accepted the vancomycin as was ordered.  However, after approximately 1 week of receiving vancomycin he once again began to refuse this treatment and specifically indicated that the reason for his refusal was that he wanted to return to his sending facility.

Docket # 30-4, p. 3.  That same medical record indicated that the lab tests had mixed results for Valley Fever.  *Id.* at 4.

On November 17, 2010, Dr. Tuvera saw Paredez again for a follow-up appointment about the spinal infection.  Dr. Tuvera increased the morphine sulfate SA to 45 milligrams from twice to thrice a day.  Dr. Tuvera also continued the morphine sulfate IR for breakthrough pain.  And Dr. Tuvera submitted a medical chrono for a walker.

On December 6, 2010, while passing out medications to inmates, psychiatric technician Steele caught Paredez hoarding his morphine pills by attempting to hide them in a cup rather than swallowing them as directed.  Steele issued a rules violation report and documented the incident on Paredez's medical administration record.  Paredez was again caught hoarding his morphine during the evening pill distribution on December 7, 2010.  Steele documented the incident in a chrono and in the medical administration record.

Paredez did not receive his morphine dosage a couple of days later.  An internal investigation at Salinas Valley determined that the morphine was not delivered to the patient due to a pharmacy error in the processing of a medication order, rather than as a result of any request by psychiatric technician Steele.  *See* Docket # 28-1.

The State of California's Prison Health Care Service's Pain Management Guidelines state that continuing to provide opioid (narcotic) therapy is absolutely contraindicated for an inmate who is actively diverting his narcotics.  "Hoarding" or "cheeking" medication is considered diversion of narcotics under these guidelines, according to Dr. Bright.

Dr. Bright served as the chair of the prison's pain management committee.  Upon a review of Paredez's medical case and based on the Prison Health Care Service's Pain Management Guidelines, the pain management committee had determined that Paredez should be weaned off morphine due to his active diversion of the morphine.  On December 24, 2010, Dr. Bright issued a notice to Paredez on behalf of the pain management committee regarding the December 6, 2010 morphine diversion incident.

On December 15, 2010, Dr. Bright conducted another ADA consultation in response to another administrative grievance in which Paredez had complained of severe pain in his joints and requested a wheelchair and walker.  Dr. Bright noted that "Paredez did not complain of back pain or leg weakness.  Because there was no medical evidence of diffuse arthralgia (joint pain), [Dr. Bright] determined that Paredez did not qualify for a wheelchair or walker at the time." Bright Decl., ¶ 7.

On December 21, Dr. Tuvera examined Paredez for a follow-up on his back pain.  Dr. Tuvera continued Paredez on morphine sulfate SA 30 mg. twice a day for 14 more days.  He also

4

1    ordered blood tests, including a test for Valley Fever.

2         On January 4, 2011, Paredez saw Dr. Tuvera and complained of joint pain.  Paredez and

3    Dr. Tuvera discussed the December 6 and 7 morphine hoarding incident and the dangers of such

4    diversion.  Dr. Tuvera prescribed two tablets of Tylenol No. 3 thrice a day for the joint pain.

5    *See* Sullivan Decl., Ex. S.  Dr. Tuvera also scheduled a follow-up appointment and referred

6    Paredez to Dr. Bright for pain control management.

7         On January 11, 2011, Paredez saw Dr. Tuvera with complaints of severe pain, and stated

8    that Tylenol was insufficient to control his pain.  Dr. Tuvera discontinued the Tylenol

9    prescription and prescribed 15 milligrams of methadone twice a day.  Though it was a narcotic,

10   Dr. Tuvera thought methadone was less susceptible to diversion by the patient.

11        On January 25, 2011, Paredez had a follow-up appointment with Dr. Tuvera.  During this

12   visit Dr. Tuvera noted that a January 13, 2011 lab test for Valley Fever had negative results for

13   antibodies.

14        Dr. Mack saw Paredez on February 4, 2011.  He discontinued the Diflucan that had been

15   prescribed for the Valley Fever because there was no evidence of Valley Fever per the January

16   13 test.  On February 15, 2011, Dr. Mack ordered a blood test, including a test for Valley Fever.

17    That blood test also was negative for Valley Fever.

18        On February 25, 2011, Paredez saw Dr. Mack and complained of lower back pain and

19   was concerned about the previous diagnosis of Valley Fever.  Dr. Mack informed Paredez that

20   the most recent blood tests showed no evidence of Valley Fever.

21

22                              **VENUE AND JURISDICTION**

23        Venue is proper in the Northern District of California because the events or omissions

24   giving rise to the claims occurred at Salinas Valley State Prison in Monterey County, which is

25   located within the Northern District.  *See* 28 U.S.C. §§ 84, 1391(b).  This court has federal

26   question jurisdiction over this action brought under 42 U.S.C. § 1983.  *See* 28 U.S.C. § 1331.

27

28

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Generally, as is the situation with defendants' challenge to the Eighth Amendment and retaliation claims, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

Where, as is the situation with defendants' qualified immunity defense, the moving party bears the burden of proof at trial, the moving party must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on each issue material to the affirmative defense. *Id.* at 1537; *see also Anderson*, 477 U.S. at 248. When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn. 10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct,

6

and allegations were not based purely on his belief but on his personal knowledge). Plaintiff's complaint is verified and therefore may be considered as evidence. More specifically, pages 1-18 of the document are verified and count as evidence, although the attachments thereto (including the timeline) are not verified and are not evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence on a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

## DISCUSSION

A.  Eighth Amendment Claims

Deliberate indifference to a prisoner's serious medical needs amounts to the cruel and unusual punishment prohibited by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Accordingly, evaluating a claim of deliberate indifference necessitates examining "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *Estelle*, 429 U.S. at 104). A prison official exhibits deliberate indifference when he or she knows of and disregards a substantial risk of serious harm to inmate health. *See Farmer*, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he or she must actually draw that inference. *Id.* A mere difference of opinion as to which medically acceptable course of treatment should be

1  followed does not establish deliberate indifference.  *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th

2  Cir. 1989).  Where doctors have chosen one course of action and a prisoner-plaintiff contends

3  that they should have chosen another course of action, the plaintiff "must show that the course

4  of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the

5  plaintiff must show that they chose this course in conscious disregard of an excessive risk to

6  plaintiff's health."  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations

7  omitted).

8

9          1.      Dr. Tuvera

10  Paredez claims that Dr. Tuvera was deliberately indifferent in that he ignored Paredez's

11  requests for care for his pain and refused to run diagnostic tests.  The focus here is on the

12  subjective prong of the Eighth Amendment test, i.e., whether Dr. Tuvera was deliberately

13  indifferent in response to Paredez's back pain as there is ample evidence that Paredez had back

14  pain and a spinal problem.

15  Paredez fails to show a triable issue of material fact on his deliberate indifference claim

16  with regard to his back pain.  The undisputed evidence shows that Dr. Tuvera prescribed pain

17  medication (i.e., morphine sulfate), then increased the amount of pain medication in response

18  to the patient's further complaints of pain, and then reduced the pain medications pursuant to

19  policy once the inmate was reported to have abused the narcotics.  Even when the morphine

20  sulfate finally was discontinued after having been reduced, Dr. Tuvera prescribed different pain

21  medications (i.e., Tylenol # 3 and methadone) in place of the morphine sulfate.  Dr. Tuvera also

22  requested assistive devices for the patient, i.e., a cane on September 21, 2010, a wheelchair on

23  October 6, 2010, a cane (again) on October 21, 2010, and a walker on November 17, 2010.

24  Paredez appears to argue that his medication should not have been reduced because the

25  charge against him was refusing a direct order rather than diverting his medication.  *See* Docket

26  # 30-3.  While he is correct that the rule violation report did charge him with refusing a direct

27  order, the order he was charged with refusing to follow was to swallow the medications he had

28  hidden in a cup instead of swallowing.  His conduct had both disciplinary and medical

1  repercussions.  The decision to wean him from morphine was pursuant to a medical policy that

2  was separate from any disciplinary charge that may have been made.  *See* Docket # 19-1, p. 5;

3  Bright Decl., ¶ 7; Tuvera Decl., ¶ 11; Sullivan Decl., Ex. J.  Paredez also suggests that the

4  impropriety of the weaning is evident because the normal response was to crush and float

5  medication after an inmate was caught hoarding it.  Even assuming there is such a normal

6  practice for medication in general, Paredez's suggestion fails to account for the fact that the

7  sustained action morphine could not be crushed for delivery without risking a fatal reaction from

8  the patient.  *See* Tuvera Decl., ¶ 4.

9  With regard to the allegation that Dr. Tuvera did not do diagnostic tests, the evidence in

10  the record shows that Dr. Tuvera did order several tests to aid in diagnosis and treatment of

11  Paredez.  Dr. Tuvera ordered an x-ray of the lumbosacral spine and blood tests.  After reviewing

12  the x-ray, he referred Paredez to an outside hospital for a CT scan of his pelvis and lumbar

13  regions.  Shortly thereafter, Paredez was diagnosed with osteomyelitis of the lumbar and was

14  offered intravenous antibiotics at outside facilities (i.e., a regular hospital and a prison hospital),

15  although he chose not to complete the course of antibiotics offered him before returning to

16  Salinas Valley.  On December 15, 2010, Dr. Tuvera ordered blood tests, including one for Valley

17  Fever.  Paredez fails to provide any evidence as to the tests that should have been, but were not,

18  run.  And he presents no evidence that would enable a reasonable jury to conclude that the

19  failure to order such tests amounted to deliberate indifference to a serious medical need.

20  Paredez may disagree with the level of pain medication and the aggressiveness of the

21  testing undertaken by Dr. Tuvera, but those disagreements do not demonstrate a triable issue in

22  support of his claim that Dr. Tuvera acted with the deliberate indifference necessary for Paredez

23  to survive the summary judgment motion on his Eighth Amendment claim.

24

25  2.  Dr. Mack

26  In his complaint, Paredez alleges that Dr. Mack was deliberately indifferent to his medical

27  needs in that he discontinued treatment for Paredez's Valley Fever.  Paredez fails to show a

28  triable issue of fact in support of his claim because, although a doctor at another facility thought

Paredez had Valley Fever, the tests done upon Paredez's return to Salinas Valley came back negative for Valley Fever. The evidence is undisputed that Dr. Mack discontinued the Valley Fever treatment after a lab test was negative for the Valley Fever antibodies. And it is undisputed that another blood test Dr. Mack ordered also was negative for Valley Fever. Additionally, the evidence is undisputed that the treatment for Valley Fever (i.e., Diflucan) could have adverse effects on the liver, which was an increased concern for a patient such as Paredez, who had hepatitis C. Viewing the evidence in the light most favorable to Paredez and drawing the reasonable inferences in his favor, no reasonable juror could find that Dr. Mack acted with deliberate indifference to serious medical needs when he discontinued the Diflucan prescription after Paredez tested negative for Valley Fever.

### 3.    Psychiatric Technician Steele

Paredez alleges in his complaint that psychiatric technician Steele falsified documents to have his pain medication discontinued. Paredez does not controvert psychiatric technician Steele's evidence that he witnessed Paredez trying to divert the morphine that was provided to him during the daily medication distribution. Steele documented the two incidents in the medical records and wrote a serious rule violation report about the first incident. Although he contends that Steele "submitt[ed] false documents," Docket # 1, p. 16, Paredez does not identify what the false documents were and what was false about them. His generalized claim that documents were falsified is insufficient to raise a triable issue of fact that Steele falsified documents for the purpose of depriving him of medication. The evidence does show that Paredez was weaned from morphine after Steele reported the hoarding incident, but the evidence is undisputed that those changes in Paredez's medications were deliberate choices by the doctors – not Steele – and were done pursuant to an established policy to deal with diversion of medication. Steele may have started the process with the report of pill hoarding, but there is no evidence that he made the decision to reduce the medication.

A dosage of morphine was not delivered to Paredez a couple of days after he was observed hoarding morphine. Paredez does not controvert defendants' evidence (i.e., Docket #

28-1) that the missed dosage was due to a mistake in the pharmacy rather than due to Steele's actions.   There is no evidence that Steele intended or caused Paredez not to get his dose of pain medication a couple of days after the pill hoarding incident.   There was a mistake, but the mistake here does not rise to the level of deliberate indifference, and certainly not one of Steele's doing.

Even viewing the evidence in the light most favorable to Paredez and drawing the reasonable inferences in his favor, no reasonable juror could find that defendant Steele acted with deliberate indifference to serious medical needs.

4.   <u>Dr. Bright</u>

Paredez claims that Dr. Bright violated his Eighth Amendment rights by denying a wheelchair and cane and by taking part in weaning Paredez from morphine.

Paredez fails to show a triable issue of fact on his claim against Dr. Bright.   The evidence shows that Dr. Bright conducted an ADA consultation on October 22, 2010 for Paredez's administrative grievance requesting a cane or wheelchair and to be housed on a lower bunk, and conducted a physical examination and record review as part of that consultation.   The evidence is undisputed that Dr. Bright determined that Paredez did not then have spinal cord compression and was able to ambulate.   Dr. Bright was of the opinion that a cane would relieve pressure on only one leg and would not relieve Paredez of back pain, and that a wheelchair would not relieve back pain because pressure on the spine would stay the same whether the patient was walking or sitting.[1]   Since Paredez had neither atrophy nor muscle weakness in one leg that would warrant a cane, nor weakness in both legs that would warrant a wheelchair, Dr. Bright denied

---

[1]Dr. Bright's medical consultation report is far from soothing from a bedside manner perspective, but its harshness appears to stem more from the author's frustration with a patient's decision that might lead to an avoidable medical calamity rather than indifference to the patient's needs.  *See* Sullivan Decl., Ex. H.  The report reflects Dr. Bright's grave concern that the inmate was making a very bad choice by refusing to finish the full course of antibiotics, and that he might need a wheelchair in the future if he continued to refuse the antibiotics and developed paralysis.  The report also show that Dr. Bright made sure that Paredez understood the risks associated with his refusal of antibiotics: "[w]ith discussion he understands that he has a risk of being paralyzed or having sepsis and death by refusing his antibiotics."  *Id.*

the requests.  Paredez presents no evidence to contradict or undermine Dr. Bright's evidence that his conclusions were medically sound.  Although Dr. Tuvera had recommended a cane and wheelchair and Dr. Bright rejected them, that only demonstrates that there was a difference of opinion among doctors who had examined the patient.  Paredez presented no evidence to dispute defendants' evidence that neither a wheelchair nor a cane was medically beneficial for his particular back problems.

The evidence also shows that Dr. Bright conducted another ADA consultation on December 15, 2010 for Paredez's administrative grievance that complained of widespread joint pain and requested a wheelchair and a walker.  Paredez did not complain of back pain or leg weakness, although he complained of pain in both knees, all his fingers, elbows and shoulders. Sullivan Decl., Ex. I.  Dr. Bright did a physical examination and documented the results in the medical consultation report.  *See id.*  Dr. Bright determined that Paredez did not qualify for a wheelchair or walker because, although he had complained of joint pain, there was no medical evidence that he had diffuse arthralgia (joint pain) necessitating the assistive devices.  *See id.*; Bright Decl., ¶ 7.  Paredez does not dispute Dr. Bright's evidence that there was no medical evidence of joint pain that warranted a wheelchair or walker.  Paredez fails to show a triable issue of fact that Dr. Bright was deliberately indifferent in denying his request for a wheelchair and walker after conducting an examination and record review that resulted in him concluding that there was no medical evidence to support the complaints of diffuse joint pain.

Dr. Bright played a role in reducing and eventually eliminating morphine sulfate for Paredez.  The evidence is undisputed that the morphine sulfate was tapered and eventually eliminated pursuant to an existing policy that stated narcotics were contraindicated for a patient who was diverting medications, and the evidence is undisputed that other pain medications (i.e., Tylenol # 3 and later methadone) were offered to Paredez in place of the morphine sulfate.  On the evidence in the record, no reasonable jury could conclude that Dr. Bright had acted with deliberate indifference in participating in the decision to reduce and then eliminate the morphine sulfate in accord with statewide policy.

Defendants have met their burden on summary judgment of showing the absence of

12

evidence that they acted with the deliberate indifference necessary for an Eighth Amendment violation.  To survive summary judgment, Paredez had to – but did not – provide evidence that the course of treatment the medical staff chose was "medically unacceptable under the circumstances" and that the course was chosen "in conscious disregard of an excessive risk" to his health.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).  When the evidence is viewed in the light most favorable to Paredez, and inferences therefrom drawn in his favor, no reasonable jury could return a verdict for him and against defendants on his Eighth Amendment claims.  Defendants therefore are entitled to judgment as a matter of law on the Eighth Amendment claims.

B.      Retaliation Claims

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).  The provision of adequate medical care to inmates to maintain their health is a legitimate correctional goal.

Paredez alleged in his complaint that many of the defendants' medical care decisions were retaliatory in nature.  Dr. Tuvera allegedly retaliated against Paredez in response to Paredez's past complaints about medical care, "useing (sic) set treatment for plaintiff's acute pain to coerce plaintiff to withdraw past complaints" about health care.  Docket # 1, p. 10.  Dr. Mack allegedly discontinued and/or reduced Paredez's pain treatment because Paredez filed an inmate appeal against Dr. Mack for discontinuing his Valley Fever medication.  Psychiatric technician Steele allegedly falsified documents to have his pain medication discontinued allegedly to retaliate for Paredez's complaints about Steele's attitude and treatment of him and other inmates.  Dr. Bright allegedly rejected his wheelchair and cane requests and reduced the pain medications to retaliate against Paredez for his refusal to withdraw a grievance.

Paredez does not provide any evidence to dispute defendants' evidence that the reduction and eventual elimination of the morphine sulfate reasonably advanced legitimate medical goals. *Cf. Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (summary judgment proper for defendants on claim of retaliatory reclassification when the reclassification was supported by "some evidence" and served a legitimate penological goal). The undisputed evidence shows that the defendants were exercising reasonable medical judgment when they decided to decrease and eventually eliminate the dosage of morphine sulfate after Paredez was discovered trying to divert the medication rather than take it. Viewing the evidence and the reasonable inferences therefrom in the light most favorable to plaintiff, no reasonable jury could find in his favor on the retaliation claim with regard to the reduction and cessation of the morphine sulfate.

Paredez also does dispute defendants' evidence that psychiatric technician Steele's actions in reporting the situation when he caught Paredez trying to divert morphine sulfate reasonably advanced legitimate medical goals. In light of the undisputed evidence that Steele observed the inmate trying to divert the narcotic, and the existence of a policy that stated that narcotics were contraindicated for inmates who diverted the narcotics, no reasonable jury could find in Paredez's favor on his retaliation claim with regard to Steele's actions in writing a rules violation report and noting the pill-hoarding incident in Paredez's medical records.

Finally, Paredez does not raise a triable issue of fact that Dr. Bright was not advancing legitimate medical goals when he denied the wheelchair, cane and walker. The undisputed evidence shows that Dr. Bright was exercising reasonable medical judgment when, upon physically examining the inmate and reviewing his records, Dr. Bright determined that the assistive devices were not necessary in light of the medical evidence before him. Viewing the evidence and the reasonable inferences therefrom in the light most favorable to plaintiff, no reasonable jury could find in his favor on the retaliation claim with regard to the denial of his requests for the wheelchair, cane and walker.

Viewing the evidence and the reasonable inferences therefrom in the light most favorable to plaintiff, no reasonable jury could find in his favor on the retaliation claims. Defendants are entitled to judgment as a matter of law on the retaliation claims.

C.    Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists.    First, the court asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* at 201.  If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail.  *See id.*  If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . .  'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Although *Saucier* required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As discussed in the preceding section, the evidence in the record does not establish a violation of Paredez's constitutional rights.  Defendants prevail on the first step of the *Saucier* analysis.  Even if a constitutional violation had been shown, however, defendants would prevail on the second step of the *Saucier* analysis.  With the undisputed evidence being that the patient tried to hoard a narcotic, a reasonable medical staff member would not have understood that documenting it would violate the prisoner's First or Eighth Amendment rights.  With the undisputed evidence being that the patient had done something (i.e., hoard pills) that made the morphine sulfate contraindicated, reasonable prison doctors would not have understood that reducing and eventually substituting the narcotic with other pain medications would violate the prisoner's First or Eighth Amendment rights.    With the undisputed evidence being that the

15

patient's back pain would continue with or without a wheelchair or cane, a reasonable prison doctor would not have understood that denying those devices would violate his First or Eighth Amendment rights.  Finally, in light of the undisputed evidence that Paredez's medical records and physical examination did not support his complaints of overall joint pain, a reasonable prison doctor would not have understood that denying a wheelchair or walker would violate his First or Eighth Amendment rights.  Qualified immunity for the denial of the assistive devices is further supported by the patient's conduct, i.e., a reasonable prison official in Dr. Bright's position would have been aware (at the time of the first decision) that the patient complaining of back pain had not bothered to complete the prescribed course of antibiotics to address that back pain and (at the time of the second decision) that the patient chose to not take his pain medications when administered to him.  Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

D.     Unserved Defendant

In the order directing service, the court concluded that Paredez's complaint had stated a cognizable Eighth Amendment claim against Dr. Bridgenelle for allegedly reducing Paredez's pain medication.  Due to an oversight at the court, Dr. Bridgenelle was not served with process. The undisputed evidence that supports summary judgment for other defendants on the medication claim also supports summary judgment in favor of Bridgenelle.  Paredez's own unsworn statement indicates that Dr. Bridgenelle gave him a new pain medication (i.e., a shot of Toradol) at the clinic at the time he allegedly reduced his medication.  *See* Docket # 1, pp. 20-21.  There is no evidence or argument that the shot of Toradol was "medically unacceptable under the circumstances," and chosen in "conscious disregard of an excessive risk to plaintiff's health."  *Jackson*, 90 F.3d  332.  Accordingly, the court will grant summary judgment in favor of this unserved defendant as well as the appearing defendants.  *See Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery*, 44 F.3d 800, 803 (9th Cir. 1995) (affirming summary judgment in favor of nonappearing defendant, where plaintiff, in response to motion filed by defendant who had appeared, had "full and fair opportunity to brief and present evidence" on dispositive issue

1    as to claim against nonappearing defendant).

2

3                                   **CONCLUSION**

4         For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

5    (Docket # 19.)   Defendants are entitled to judgment as a matter of law on the merits of the

6    Eighth Amendment and retaliation claims and on their defense of qualified immunity. Judgment

7    will be entered in all defendants' favor and against plaintiff.

8         The clerk will close the file.

9         IT IS SO ORDERED.

10   Dated: January 24, 2013

                                        _____

11                                       SUSAN ILLSTON
                                 United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17